UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

LUZ STELLA PAZ,

                          Plaintiff,

         v.

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
14-CV-6885 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Luz Stella Paz, proceeding *pro se*, filed the above-captioned action seeking review pursuant to 42 U.S.C. § 405(g) of a final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for Social Security disability insurance benefits and Supplemental Security Income ("SSI"). The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the decision of Administrative Law Judge Gal Lahat (the "ALJ") is supported by substantial evidence and should be affirmed. (Comm'r Notice of Mot. for J. on the Pleadings ("Comm'r Mot."), Docket Entry No. 16; Comm'r Mem. of Law in Supp. of Comm'r Mot. ("Comm'r Mem."), Docket Entry No. 17; Comm'r Reply Mem. of Law in Further Supp. of Comm'r Mot. ("Comm'r Reply"), Docket Entry No. 19.) Plaintiff opposes the motion. (Pl. Opp'n to Comm'r Mot. ("Pl. Opp'n"), Docket Entry No. 18.) For the reasons set forth below, the Court denies the Commissioner's motion for judgment on the pleadings.

## I. Background

Plaintiff is a fifty-six-year-old woman with a high school education. (R. 56–58; Docket Entry Nos. 7–8.) Plaintiff last worked in 2010, providing home care to the elderly. (R. 59–61.)

Plaintiff applied for disability insurance benefits and SSI on July 12, 2010, alleging disability due to degenerative joint disease of the right shoulder, knee disorder, depression, anxiety, a history of breast cancer, multiple surgeries, obesity, and diabetes, with an alleged onset date of January 31, 2007. (R. 26; Compl. ¶ 4.) Plaintiff's application was denied on February 17, 2011. (R. 26.) Plaintiff timely requested a hearing before an ALJ, which was held on August 1, 2012. (*Id.*) On December 14, 2012, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 23–38.) Plaintiff appealed the ALJ's decision to the Appeals Council and, on July 25, 2014, the Appeals Council denied Plaintiff's request for review. (R. 4.)

### a. Plaintiff's testimony

Plaintiff last worked in 2010 for about six months, providing home care to the elderly and taking them to their medical appointments. (R. 59–61.) Plaintiff performed this work two times per week. (R. 60.) In 2009, Plaintiff temporarily worked for Cox Marketing Company as a sales representative. (R. 61–62.) In 2003, and again in 2006, Plaintiff was self-employed, handling marketing and logistical tasks for a group of home builders. (R. 62–63.) In 2000, Plaintiff worked as an administrative assistant for the State of Florida's Children's Medical Services. (R. 63–65.)

Plaintiff has had various physical impairments. In 2002, Plaintiff was in a car accident and, as a result, regularly becomes dizzy and has headaches and pain in her neck. (R. 69, 79–80.) The dizziness and headaches became "worse" over the course of the two-year period prior to the hearing. (R. 70.) In 2008, Plaintiff was diagnosed with diabetes and in 2011, she was diagnosed with high blood pressure. (R. 68.) Plaintiff was prescribed Metformin to treat her diabetes but experiences "continuous" diarrhea as a side effect of the medication. (R. 70–71.) Plaintiff suffers from temporomandibular joint dysfunction, which causes her jaw to

lock and her teeth to decay. (R. 76.) Plaintiff experiences pain in her bones and joints, which she attributes to osteoporosis, arthritis, and fibromyalgia and to a fall she experienced in 2006. (R. 76–79.) In May of 2012, Plaintiff was diagnosed with stomach ulcers and pancreatitis and, as a result, her gallbladder was removed. (R. 81.) Plaintiff was the victim of domestic violence and was punched in her left eye. (R. 89–90.) As a result, Plaintiff has vision problems. (*Id.*)

Plaintiff has been treated for various types of cancer. In 2000, Plaintiff underwent a lumpectomy to treat breast cancer in her left breast and, for five years thereafter, she underwent chemotherapy and radiation as part of a clinical research study at the Moffitt Cancer Center in Florida. (R. 83.) In 2002, Plaintiff underwent a hysterectomy to treat ovarian cancer. (R. 82.) In 2004, Plaintiff underwent another lumpectomy to remove a benign tumor. (R. 84–85.) In December of 2009, she underwent bilateral mastectomies. (R. 85.) In 2010, Plaintiff underwent two breast reconstructive surgeries. (R. 85.)

As to her mental health impairments, Plaintiff has been depressed for many years because of her health issues and her history of physical and sexual abuse. (R. 86–87.) Plaintiff attempted suicide in 1984 and in 1991. (R. 88.) She has not received any treatment for her depression, which is getting worse because of her poor health. (R. 89.)

Plaintiff can stand for twenty to thirty minutes at a time. (R. 91.) Plaintiff testified that sitting for an unspecified period of time causes back and neck pain. (R. 91–92.) Plaintiff can carry up to ten pounds. (R. 92.) She is able to dress and bathe herself. (*Id.*) Plaintiff uses public transportation to get to her medical appointments and she also drives herself. (*Id.*) Plaintiff prepares her own meals, shops for groceries and washes her dishes. (R. 92–93.) Plaintiff is unable to do her laundry or clean her home. (R. 93.)

Plaintiff moved to New York from Florida two years prior to the hearing. (R. 56–57.) At the time of the hearing, Plaintiff lived with her three children in her adult daughter's home. (R. 57.) Over the course of the four years prior to the hearing, Plaintiff travelled "at least four times" between Florida and New York to receive medical treatment. (R. 57, 93–94.) In Florida, she receives medical treatment at the Moffitt Cancer Center and, in New York, she receives medical treatment at Elmhurst Hospital. (R. 94–95.)

### b. Medical evidence

### i. H. Lee Moffitt Cancer Center

Plaintiff was first diagnosed with breast cancer in 1998 and has been treated at the H. Lee Moffitt Cancer Center ("Moffitt"), located in Tampa, Florida.

### 1. Cancer operation and treatments

On August 21, 1998, Dr. Charles Cox, M.D., performed a lumpectomy of Plaintiff's left breast, removing twenty lymph nodes. (R. 368, 586.) Over the course of the next five years, Plaintiff underwent four cycles of chemotherapy, followed by radiation. (R. 360, 368.) Until September of 2004, Plaintiff participated in a cancer treatment research trial that treated her cancer with Toremifene. (R. 368.)

On August 9, 1999, Plaintiff underwent a colonoscopy. (R. 616–17.) Dr. James Barthel, M.D., removed a single, small rectal polyp, but noted that the results of the colonoscopy were "essentially negative." (R. 614, 617.) On August 19, 1999, Plaintiff underwent a hysterectomy and bilateral oophorectomy to remove a benign cyst. (R. 473, 604–08.) Dr. Edward Grendys, M.D., noted that there was no evidence of malignancy. (R. 609.)

On October 14, 2003, Plaintiff had an annual follow-up exam with Dr. Cox. (R. 634.) Dr. Cox noted that Plaintiff had a history of left breast cancer but that there was no evidence of the disease. (*Id.*) On February 28, 2005, Dr. John Horton, M.B.C.H.B., F.A.C.P., examined

Plaintiff and found "no evidence of any persistence or recurrence of [Plaintiff's] breast cancer. (R. 653.)

In 2005 or 2006, Plaintiff underwent a Mohs procedure to remove a basal cell carcinoma from her scalp.[1]  (R. 473, 654–655.)

On October 6, 2009, Plaintiff met with Dr. Susan Minton, D.O.  (R. 473–76.)  Plaintiff reported that she had "not had [a] medical follow-up for several years due to lack of insurance" but had obtained Medicaid coverage and was attempting "to get caught up on" her medical appointments.  (R. 473–74.)  Plaintiff complained of fatigue and a "long-standing history of depression."  (*Id.*)  An examination revealed no evidence of breast cancer.  (R. 475.)

On November 5, 2009, Dr. James Helm, M.D., performed a colonoscopy on Plaintiff, which revealed a "[n]ormal colon without evidence of neoplasia."  (R. 493.)

On February 9, 2011, Dr. Helm performed a colonoscopy on Plaintiff because Plaintiff was experiencing pain in her bowel movements and diarrhea.  (R. 758.)  Dr. Helm removed a "[d]iminutive cecal polyp," and observed that there was "no evidence of colitis or other abnormalities."  (*Id.*)

### 2.  Breast reconstruction surgery and treatments

On October 21, 2009, Plaintiff met with Dr. Paul Smith, M.D., and told him that she wanted to undergo breast reconstruction surgery.  (R. 487–89.)  Dr. Smith examined Plaintiff and recommended a complete mastectomy and reconstruction.  (R. 487.)

---

[1]  A Mohs procedure is "a technique for removal of skin tumors with a minimum of normal tissue, by prior necrosis with zinc chloride paste, mapping of the tumor site, and excision and microscopic examination of frozen section of thin horizontal layers of tissue, until all of the tumor is removed."  *Mohs chemosurgery*, *Stedman's Medical Dictionary* (28th ed. 2006).

On December 30, 2009, Dr. Rami Ghurani, M.D., performed bilateral prophylactic mastectomies on Plaintiff. (R. 498–504.) Dr. Ghurani also performed latissimus dorsi flap reconstruction, with expander, on Plaintiff's left breast and "expander alone reconstruction" on her right breast. (R. 498.) Dr. Ghurani noted "no complications." (R. 499.) After the surgery, Dr. Gourami observed ecchymosis and a small area of necrosis on Plaintiff's right breast. (R. 516.)

On January 28, 2010, Dr. Ghurani examined Plaintiff. (R. 539.) Plaintiff complained of breast pain and tingling down her right arm. (*Id.*) Dr. Ghurani observed that Plaintiff's epidermolysis was "healing nicely" and that her left latissimus dorsi flap was "viable and healing well." (*Id.*) Dr. Ghurani recommended that Plaintiff undergo a right latissimus dorsi flap reconstruction and that her right expander be replaced. (R. 540.)

On February 24, 2010, Plaintiff met with Dr. Smith and reported that the results from her breast reconstruction surgery were "inadequate." (R. 534.) Dr. Smith noted that Plaintiff's left latissimus dorsi flap reconstruction had produced a "very good result" but that her right breast had "some tissue deficiency," which would require "new tissue recruitment." (*Id.*) Dr. Smith recommended that Plaintiff undergo right latissimus dorsi flap reconstruction. (*Id.*)

On April 5, 2010, Dr. Ghurani performed latissimus dorsi flap reconstruction on Plaintiff's right breast. (R. 495–497, 513–514.) Two weeks later, on April 22, 2010, Plaintiff met with Dr. Ghurani. (R. 482–83.) Dr. Ghurani noted that Plaintiff was "doing well." (R. 483.) Plaintiff reported that she wanted her breasts to be "a little bit larger." (*Id.*) Dr. Ghurani determined that more fluid would be placed in the tissue expander and that Plaintiff would be "scheduled for implant exchange." (*Id.*)

On April 26, May 10, and May 24 of 2010, Dr. Ghurani expanded Plaintiff's breasts by increasing the amount of saline in her tissue expanders. (R. 479–82.) Dr. Gourami noted that Plaintiff was "doing well." (R. 481.) On June 14, 2010, Plaintiff underwent her final expansion surgery. (R. 477.)

On October 4, 2010, Dr. Smith exchanged Plaintiff's bilateral tissue expanders for permanent implants and performed "[c]omplex reconstruction of [the] previous left breast reconstruction." (R. 398–401, 406–08.) On October 13, 2010, Dr. Smith examined Plaintiff. (R. 366–67.) Plaintiff reported more pain on her left side than her right side but stated that she was "overall pleased with her result." (R. 366.) Dr. Smith noted that Plaintiff was "doing well." (*Id.*) He also noted that because of the amount of asymmetry, Plaintiff would need a "slight revision" to her right breast. (R. 367.)

On January 7, 2011, Plaintiff met with Dr. Shirley Codada, M.D. (R. 388–90.) Plaintiff reported problems with her breast reconstruction, stating that she thought she had a "huge defect" in her breasts. (R. 388.)

On January 27, 2011, Plaintiff met with Dr. John Kiluk, M.D. (R. 360–61.) Plaintiff informed Dr. Kiluk that she was not satisfied with the outcome of her breast reconstruction and complained of "pain throughout her body." (R. 360.) Upon examining Plaintiff, Dr. Kiluk determined that there was "no evidence" of a recurrence of Plaintiff's cancer and noted that Plaintiff had a "good cosmetic outcome." (*Id.*)

On March 25, 2011, Dr. Smith performed nipple reconstruction, revision of right breast reconstruction and liposuction on Plaintiff. (R. 761–63.)

On December 21, 2011, Plaintiff met with Dr. Sergio Alvarez, M.D. (R. 798.) Plaintiff expressed concern that her breast implants had ruptured because of a dramatic and rapid decrease

in their size.  (*Id.*)  Dr. Alvarez examined Plaintiff and observed that there were no "signs of

rupture," but noted that Plaintiff' breasts were tender to palpitation.  (*Id.*)  Plaintiff underwent a

magnetic reasoning imaging ("MRI") of her breasts on February 9. 2012.  (R. 2350.)  The results

revealed that both implants were intact and that there was no evidence of malignancy.  (*Id.*)

### 3.    Other procedures

On October 14, 2010, Dr. Anne Hermann, M.D., performed acupuncture on Plaintiff's

"governor vessel," gallbladder, right shoulder, stomach, "conception vessel," spleen, stomach,

and kidneys.  (R. 384–386.)  Plaintiff complained of right shoulder pain and rheumatoid arthritis

and stated that she wanted to lose weight because of her diabetes.  (R. 385.)  Dr. Hermann noted

that Plaintiff struggled with depression but was not suicidal.  (*Id.*)  Dr. Hermann examined

Plaintiff and observed that Plaintiff had tenderness in her right shoulder and derangement of her

right knee.  (*Id.*)  Dr. Hermann diagnosed Plaintiff with obesity, right shoulder tendonitis,

bilateral knee pain secondary to rheumatoid arthritis and lower abdominal pain.  (R. 386.)

On January 7, 2011, Plaintiff met with Dr. Codada.  (R. 388–90.)  In addition to reporting

problems with her breast reconstruction, as discussed above, Plaintiff reported that she had

"multiple financial stressors."  (R. 388.)  Plaintiff also reported that, as a result of her depression,

she would not leave bed for days at a time and would not shower.  (*Id.*)  Plaintiff also reported

severe memory deficit since taking Prozac to treat her depression.  (R. 389.)  Dr. Codada

observed that Plaintiff's lungs crackled, that she had tenderness in her right shoulder and that she

had mild tenderness over her clavicle.  (*Id.*)  Dr. Codada noted that Plaintiff appeared to be

severely depressed.  (*Id.*)  Dr. Codada diagnosed Plaintiff with diabetes, "[q]uestionable right

basilar crackles," and right shoulder and chest pain.  (R. 389–90.)

### ii. Elmhurst Hospital Center

On November 10, 2008, Plaintiff went to the emergency department at the Elmhurst

Hospital Center ("Elmhurst"), located in Queens, New York.  (R. 2444–53.)  Plaintiff

complained of severe chest pain and was treated by Dr. Sandra Sallustio, M.D., and Dr. Jason

Pruzansky, M.D.  (R. 2444.)  Plaintiff rated the intensity of her pain as a nine on a scale of ten

and complained of numbness in her left arm, shortness of breath, abdominal discomfort and

dizziness.  (R. 2444–45.)  Dr. Sallustio and Dr. Pruzansky examined Plaintiff and observed that

Plaintiff was not in apparent distress, and that she had a "regular" heart rate and rhythm, a

"normal" respiratory rate, a "normal" range of motion in both arms, and decreased sensation to

light touch in her left hand.  (R. 2446.)  The doctors diagnosed Plaintiff with "atypical" chest

pain and sent Plaintiff home that same day, noting that her condition had improved and rating her

pain level as zero on a scale of ten.  (R. 2448.)

On November 25, 2008, Plaintiff went to Elmhurst for a follow-up visit and reported that

she did not have any chest pain.  (R. 2472.)  Charlita Magalong, R.N., noted that Plaintiff's blood

pressure was "elevated."  (*Id.*)

On January 2, 2009, Plaintiff went to Elmhurst for an examination.  (R. 2476.)  Dr.

June Chatterjee, M.D. examined Plaintiff and diagnosed her with obesity and depression.

(R. 2477–78.)  Dr. Chatterjee noted a history of suicide attempts by Plaintiff but determined that

Plaintiff had no current suicidal ideation.  (R. 2478.)  Plaintiff was prescribed Zoloft for her

depression.  (*Id.*)

On January 15, 2009, Dr. Joel Mollin, M.D. x-rayed both of Plaintiff's knees.  (R. 2462.)

The results revealed "mild degenerative changes" and "mild" osteopenia but no fractures or

subluxation.

On January 22, 2009, Plaintiff went to Elmhurst for a follow-up visit. (R. 2480.) She complained of left rib pain and reported that the Zoloft made her feel better. (*Id.*) Plaintiff also reported that she had no trouble climbing stairs. (R. 2481.)

On February 20, 2009, Plaintiff went to Elmhurst for an examination. (R. 2493–95.) Plaintiff reported that she had "got[ten] used to her" diabetes medication, which had previously caused her to experience discomfort in her stomach. (R. 2494.) Plaintiff also reported that she was still taking her anti-depression medication, Zoloft, and that the results were better than they had been before. (R. 2494.) Dr. Chatterjee observed that Plaintiff was not in pain and diagnosed her with "uncontrolled" diabetes and "major" depressive disorder. (R. 2493, 2495.)

On that same day, Dr. Julio Riascos, M.D., a psychiatrist, performed a psychiatric evaluation of Plaintiff. (R. 2496–98.) Plaintiff reported a history of domestic violence and suicide attempts. (R. 2497.) Dr. Riascos noted that Plaintiff "endorse[d] mild depressive symptoms" and noted that Plaintiff reported that her depression had improved because of the medication she was taking. (R. 2496.) Dr. Riascos observed that Plaintiff did not exhibit "hopelessness/helplessness," anhedonia, or symptoms of mania or psychosis. (*Id.*) He also observed that Plaintiff was calm, cooperative, had good eye contact and a constricted affect and exhibited no delusions. (R. 2497.) Dr. Riascos diagnosed Plaintiff with a history of recurring major depressive disorder, which was in partial remission because of treatment, and a history of post-traumatic stress disorder. (*Id.*) Dr. Riascos also diagnosed rule out[2] "malingering vs.

---

[2] "Rule-out" references a provisional diagnosis to be ruled out with further medical investigation. *See Straughter v. Comm'r of Soc. Sec.*, No. 12-CV-825, 2015 WL 6115648, at *16 n.38 (S.D.N.Y. Oct. 16, 2015) (explaining that psychiatric diagnoses were "rule-out or hypothetical diagnosis needing further exploration"); *Beach v. Comm'r of Soc. Sec.*, No. 11-CV-2089, 2012 WL 3135621, at *8 (S.D.N.Y. Aug. 2, 2012) ("In the medical context, a 'rule-out' diagnosis means there is evidence that the criteria for a diagnosis may be met, but more

factitious disorder" because of "inconsistencies in [Plaintiff's] story," which was "relative[ly] inverosimile," and because Plaintiff stated that she visited Dr. Riascos "to get disability due to psychiatric history." (R. 2496–97.) Dr. Riascos increased Plaintiff's prescription for Zoloft and referred her to group therapy. (*Id.*)

On March 10, 2009, Dr. Allan Goldman, M.D., performed a bone density test of Plaintiff. (R. 2459.) The results revealed osteoporosis in Plaintiff's lumbar spine and osteopenia in her femoral neck. (*Id.*)

### iii.  Peter Davis Health Center

On August 27, 2009, Plaintiff went to the Peter Davis Health Center ("PDHC"), located in Tampa, Florida, for a checkup and to refill her prescriptions. (R. 348–50.) She complained of malaise, chest and bone pain, dizziness and a skin lesion on her neck. (R. 348–49.) Katie Williams, a nurse practitioner, examined Plaintiff and observed that Plaintiff was not in acute distress, that Plaintiff's neck showed no abnormalities and that Plaintiff's blood chemistry was within the normal range. (R. 349.) Ms. Williams diagnosed Plaintiff with "dental disorders," diabetes mellitus, depression and a malignant skin neoplasm. (*Id.*)

On September 25, 2009, Dr. Maritza Perez, M.D., examined Plaintiff at PDHC. (R. 345–347.) Plaintiff complained that she was depressed and that the Zoloft medication she was taking was not relieving her depression. (R. 345.) Plaintiff asked to see a psychiatrist. (*Id.*) Dr. Perez conducted a physical examination of Plaintiff. (R. 345–46.) Dr. Perez also conducted a psychiatric examination of Plaintiff and observed that Plaintiff's appearance, mood and affect were normal, and that her "thought content revealed no impairment." (R. 346.) Dr. Perez

---

information is needed in order to rule it out." (quoting *Carrasco v. Astrue*, No. 10-CV-43, 2011 WL 499346, at *4 (CD. Cal. Feb. 8, 2011)).

diagnosed Plaintiff with diabetes mellitus, depression and a malignant skin neoplasm. (*Id.*) She increased Plaintiff's dosage of Zoloft from 50 mg to 100 mg. (*Id.*)

On February 22, 2010, Plaintiff met with Dr. Perez at PDHC. (R. 341–343.) Plaintiff complained of asthma, nausea and dizziness, hemorrhoids and diarrhea, which Plaintiff believed were caused by her diabetes medication. (R. 341.) Plaintiff also complained of rectal bleeding and told Dr. Perez that she had undergone a colonoscopy three months prior. (*Id.*) Dr. Perez examined Plaintiff and noted no systemic symptoms, nausea, abdominal pain or tenderness. (R. 345–46.) Dr. Perez diagnosed Plaintiff with asthma, hemorrhoids and type two diabetes mellitus. (R. 342.)

### iv. Dr. Eniola Owi, consultative examiner

On January 18, 2011, Plaintiff underwent a consultative examination with Dr. Eniola Owi, M.D., a specialist in occupational and internal medicine at Workhealth Occupational Medicine Clinic, after a referral from the Office of Disability Determinations. (R. 687–94.) Plaintiff reported her cancer and treatment history. (R. 687.) She told Dr. Owi that she was diagnosed with breast cancer in 1997, had undergone chemotherapy, a bilateral mastectomy and breast reconstruction, but had not had a recurrence of breast cancer. (*Id.*) Plaintiff told Dr. Owi that she had cancerous colonic polyps which were removed in 2003, and skin cancer which was treated in 2004. (*Id.*) Plaintiff complained of "right breast pain." (*Id.*) Plaintiff also recounted her history of and treatment for depression. (*Id.*) She told Dr. Owi that her depression was initially diagnosed in 1982, that she had been hospitalized in the 1980s and 1990s following suicide attempts, and that, at the time of the consultation, she was taking Fluoxetine to treat her depression. (*Id.*) Plaintiff complained of generalized body pain for which she was prescribed Percocet. (*Id.*)

Dr. Owi examined Plaintiff and observed that Plaintiff ambulated normally with no assistive device, that Plaintiff did not appear to be in acute distress, but that she had difficulty with heel and toe walking. (R. 689.) Dr. Owi determined that Plaintiff had kyphosis and scoliosis of the thoracic spine but had "no spasm or discomfort with motion." (*Id.*) Dr. Owi performed a straight-leg raising test which was negative. (*Id.*) Dr. Owi observed that Plaintiff's right shoulder showed less than normal ranges of motion and also observed that Plaintiff's ranges of motion for her cervical and lumbar spine, left shoulder, elbows, wrists, hands, hips, knees and ankles were within normal limits. (R. 692–93.) She observed that Plaintiff's right shoulder had diffuse tenderness to palpitation and Plaintiff's right knee had a cystic mass over the tibia tubercle. (R. 690.)

Dr. Owi diagnosed Plaintiff with "left breast cancer in remission," "type [two] diabetes," "right shoulder arthritis and impingement syndrome," "depression" and "chronic pain syndrome." (R. 691 (capitalization omitted).)

### v. Dr. Felix Subervi, consultative psychiatric examiner

On January 31, 2011, Dr. Felix Subervi, Ph.D. conducted a consultative psychiatric examination of Plaintiff, after a referral from the SSA Office of Disability Determinations. (R. 695–700.) Plaintiff told Dr. Subervi that she was experiencing pain in her back, breast and right arm, which pain prevented her from sleeping. (R. 695–96.) Plaintiff attributed the pain to complications from the surgeries she underwent to treat her various cancers. (*Id.*) She also told Dr. Subervi that she was suffering from hypertension, diabetes and osteoporosis. (R. 696.) Plaintiff told Dr. Subervi that she was depressed because of her physical impairments and because of her history of sexual and physical abuse. (R. 696–98.) Plaintiff stated that she was so tired of her emotional and physical impairments that sometimes she felt as though, were it not for

her children, she would not mind dying. (R. 699.) Plaintiff reported that she had been hospitalized once following an attempted suicide. (R. 698.)

Although Dr. Subervi noted that Plaintiff reported being afraid of people, he determined that there "was no abnormality" in Plaintiff's "thought content." (*Id.*) Dr. Subervi observed that Plaintiff's mood "was extremely depressed and [her] affect was sad." (*Id.*) He determined that Plaintiff was oriented to person, place, time and situation, her judgment was appropriate, her concentration was fair, her level of responsiveness was lethargic and her insight was fair. (*Id.*)

Dr. Subervi diagnosed Plaintiff with "major depression, severe, without psychotic features" and "generalized anxiety disorder secondary to declining health and physical pain." (R. 700 (capitalization omitted).) He noted a "GAF" score of forty seven.[3] (*Id.*) He concluded that Plaintiff should "receive intensive psychotherapy" and opined that she was "unable to work." (*Id.*)

### vi. Dr. P.S. Krishnamurth, M.D., state agency medical consultant

On February 14, 2011, Dr. P.S. Krishnamurthy, M.D., a state agency medical consultant, reviewed Plaintiff's medical file and completed a physical residual functional capacity ("RFC") assessment. (R. 701–08.) Dr. Krishnamurthy's "primary diagnosis" was that Plaintiff underwent a left breast lumpectomy in 1998 and his "secondary diagnosis" was that Plaintiff underwent

---

[3] The GAF score is a numeric scale ranging from "0" (lowest functioning) through "100" (highest functioning). "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, at 32 (4th ed. 2000)). "A score between 41 and 50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e .g. no friends, unable to keep a job).'" *Watson v. Astrue*, No. 08-CV-1858, 2009 WL 678717, at *5 (E.D. Pa. Mar. 13, 2009) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*).

bilateral "cosmetic mastectomy" in December of 2009.  (R. 701 (capitalization omitted).)  Dr. Krishnamurthy determined that Plaintiff had multiple exertional limitations, including Plaintiff's ability to (1) "lift and/or carry" twenty pounds "occasionally" and ten pounds "frequently," (2) "stand and/or walk" with normal breaks for "about" six hours in an eight-hour workday, (3) sit with normal breaks for "about" six hours in an eight-hour workday, and (4) "push and/or pull" without limitation, other than those limitations for lifting and carrying.  (R. 702.)  Dr. Krishnamurthy noted postural limitations, including Plaintiff's ability to climb stairs and ramps, balance, stoop, kneel, crouch and crawl "frequently," and her ability to climb ladders, ropes, or scaffolds "occasionally."  (R. 703.)  He also noted that Plaintiff's ability to reach was "limited" because of a right shoulder impingement syndrome.  (R. 704.)  Dr. Krishnamurthy did not note any visual, communicative or environmental limitations.  (R. 704–05.)

### vii.  Dr. Steven Wise, Psy.D., state agency psychological consultant

On February 16, 2011, state agency psychological consultant Dr. Steven Wise, Psy.D., reviewed Plaintiff's medical record and completed a "psychiatric review technique form," assessing Plaintiff's mental impairments under the impairments listed in Appendix 1 of the Social Security Regulations.  (R. 709–22.)  Dr. Wise considered Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders).  (R. 709, 712, 714.)  Dr. Wise concluded that Plaintiff had "mild" restrictions of daily living activities, "mild" difficulties in maintaining social functioning, and "moderate" restrictions in maintaining concentration, persistence and pace. (R. 719.)  Dr. Wise further concluded that Plaintiff had not had extended episodes of decompensation.  (*Id.*)

On the same day, Dr. Wise completed a "mental residual functional capacity" assessment form.  (R. 723–25.)  Dr. Wise concluded that Plaintiff was not significantly limited in her

understanding and memory or in her social interaction. (R. 723–24.) Dr. Wise also concluded that Plaintiff was "moderately" limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and set realistic goals or make plans independently of others. (*Id.*) Dr. Wise also concluded that Plaintiff had the mental capacity for simple repetitive type tasks, could understand and remember basic tasks, carry out simple tasks, maintain attention and concentration for routine uncomplicated tasks for two-hour periods during an eight-hour workday, complete a normal workweek without excessive interruptions from psychologically based symptoms, relate to supervisors and co-workers and adapt to simple changes and avoid hazards. (R. 725.)

### i. St. Joseph's Hospital

On May 3, 2012, Plaintiff was admitted to the emergency room at St. Joseph's Hospital ("St. Joseph's"). (R. 1283–84.) She complained of abdominal pain, nausea, vomiting and abdominal distention. (*Id.*) Dr. Pamela Wilson, M.D. examined Plaintiff and observed that Plaintiff's abdomen was mildly distended, she had epigastric tenderness, but she had no masses. (*Id.*) Dr. Wilson determined that Plaintiff was not in acute distress. (*Id.*) That same day, Plaintiff underwent a computerized tomography ("CT") scan which revealed "suspected mass" of three centimeters "in [the] ascending colon." (*Id.*) On May 4, 2012, Plaintiff underwent an upper endoscopy which revealed a hiatal hernia, an ulcer in the antrum, erosive gastritis and duodenitis. (R. 1285.) Also on May 2, 2012, Plaintiff underwent a colonoscopy which revealed "mild" diverticulosis and hemorrhoids. (R. 1285.)

On May 11, 2012, Dr. Ramesh Ashwath, M.D. diagnosed Plaintiff with acute pancreatitis. (R. 1286–87.) On May 18, 2012, Dr. Christian Bailey, M.D. performed an endoscope retrograde cholangiopancreatography ("ERCP") procedure on Plaintiff and removed an impacted gallstone. (R. 1296, 1303.) On May 21, 2012, Dr. Lentz diagnosed Plaintiff with gallstone pancreatitis, acute cholecystitis and left groin sebaceous cyst with no signs of infection. (R. 1296–97.) Dr. Scott Lentz, performed a laparoscopic cholecystectomy procedure on Plaintiff and removed her gallbladder and a left groin sebaceous cyst. (*Id.*)

On May 23, 2012, physical therapist Elizabeth Hardin conducted a physical therapy evaluation of Plaintiff. (R. 1183–84.) Hardin observed that Plaintiff had no pain symptoms, that Plaintiff could ambulate normally and independently, and that her extremities showed ranges of motion and strength "within functional limits." (*Id.*)

On May 27, 2012, Plaintiff was discharged from the hospital. (R. 1269–71.) Nurse Deborah Mullen, R.N. instructed Plaintiff to avoid strenuous activities and to eat a bland diet. (*Id.*)

### c. Additional evidence

#### i. Function report

In January of 2011, Plaintiff completed a "function report." (R. 299–306.) Plaintiff reported that her daily activities were taking her daughters to school, returning home, taking her medication, lying down for two hours because of the dizziness caused by her medication, going to bed around 11 PM but not falling asleep until 3 AM because of her pain. (R. 300.) Plaintiff sometimes needs help dressing but can otherwise perform personal care. (*Id.*) She prepares her own meals daily, but needs help from her children with the laundry. (R. 301.) Plaintiff goes outside only to take her children to school or to go to the hospital. (R. 302.) She sees her friends once a week, but her depression and anxiety make it difficult for her to get along with others.

(R. 303–04.)  Plaintiff has had problems with her memory and concentration.  (R. 299.)  Plaintiff also cannot sit or stand for long periods because of her bone and muscle pains and because of frequent dizziness.  (*Id.*)

Plaintiff's impairments cause her difficulty with lifting, standing, kneeling, seeing, remembering, completing tasks, understanding, following instructions and getting along with others.  (R. 304.)  Plaintiff uses a walker.  (R. 305.)  She can walk for ten to twenty minutes before needing to rest for five to ten minutes and can pay attention for one to two hours.  (R. 304.)  Plaintiff takes Metformin, which causes constant diarrhea, Fluoxetine, which causes drowsiness, Percocet, which causes dizziness, Xanax, which makes her tired and Advair, which makes her hyper.  (R. 306.)

### d.   Vocational expert testimony

Vocational expert Rocco Meola testified at the hearing by telephone.  (R. 97–100.)  Meola testified that Plaintiff's job as an administrative assistant was sedentary work with a specific vocational preparation ("SVP") of six and her self-employment in marketing was sedentary work with an SVP of 3.  (R. 99.)

### e.   The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration (the "SSA") under the authority of the Social Security Act (the "Act").  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 31, 2007, the alleged onset date of her disability.  (R. 29.)  Second, the ALJ found that Plaintiff had the following severe impairments: "a history of breast cancer with subsequent mastectomies and

reconstructive surgeries; diabetes; hypertension; asthma; degenerative joint disease of the right shoulder and tendinitis; obesity; and depression and anxiety."[4] (R. 29.)

Third, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or is equal to the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 30.) The ALJ considered Listings 1.00 (Musculoskeletal System Disorders), 4.00 (Cardiovascular System Disorders), 9.00 (Endocrine Disorders), 12.00 (Mental Disorders), 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), and 13.00 (Malignant Cancer Disorder). (*Id.*) The ALJ also considered Social Security Ruling 02-1p (Obesity Disorders). (*Id.*) The ALJ found that Plaintiff's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria" of these listings. (R. 29.) The ALJ explained that, in order to meet or equal these listings, Plaintiff's mental impairments must satisfy the "paragraph B criteria" which requires at least two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (*Id.*) The ALJ concluded that, based on Dr. Wise's report and Plaintiff's statements in the function report that she drives a car and shops in stores, Plaintiff has only a "mild restriction" in activities of daily living. (*Id.*) The ALJ acknowledged Plaintiff's statement that she avoids people but concluded that, based on Dr. Wise's opinion and Plaintiff's statements that she talks on the telephone and goes to church, Plaintiff has "mild difficulties" in social functioning. (*Id.*) The also ALJ concluded that, based

---

[4] The ALJ noted that the record also contained evidence of "acute pancreatitis with laparoscopic cholecystectomy, osteoporosis, gastroesophageal reflux disease (GERD)/ulcers, hemorrhoids, a knee impairment and temporomandibular joint disorder (TMJ)." (R. 29.) The ALJ found that these impairments were not severe because they did not significantly limit Plaintiff's ability to perform "basic work activities." (*Id.*)

on Dr. Wise's opinion and Plaintiff's ability to pay bills, watch television, and read newspapers, Plaintiff has "moderate difficulties" with "concentration, persistence, or pace." (*Id.*) The ALJ further concluded that Plaintiff has experienced "no episodes of decompensation . . . of extended duration." (R. 30.) The ALJ found that Plaintiff's mental impairments do not satisfy the "paragraph B criteria," or the "paragraph C criteria" in Listings 12.04 and 12.06.[5] (*Id.*)

Next, the ALJ determined that Plaintiff "has the residual functional capacity to perform light work," with the limitations that she can "lift/carry and push/pull [twenty] pounds occasionally and [ten] pounds frequently, sit [six] hours in an [eight-]hour workday, and stand/walk [six] hours in an [eight-]hour workday." (R. 30.) The ALJ also found that Plaintiff "cannot climb ladders, ropes, and scaffolds" and "must avoid exposure to excessive amounts of atmospheric or pulmonary conditions, such as dust." (*Id.*) The ALJ further found that Plaintiff "is limited to understanding, remembering, and carrying out simple instructions, making simple

---

[5] The paragraph C criteria for Listing 12.04 requires:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) Repeated episodes of decompensation, each of extended duration; or (2) A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Alsheikhmohammed v. Colvin*, No. 14-CV-461, 2015 WL 4041736, at *4 (N.D.N.Y. July 1, 2015) (citing 20 C.F.R. Part 404, Subpart P, App. 1). The paragraph C criteria for Listing 12.06 requires: "complete inability to function independently outside the area of one's home." *Id.* (citing 20 C.F.R. Part 404, Subpart P, App. 1).

work related decisions, and dealing with changes in a routine work setting" and that "[s]he retains the ability to respond appropriately to coworkers and supervisors." (*Id.*)

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected" to cause Plaintiff's symptoms, but found that, "based on the totality of the evidence," Plaintiff's statements concerning the "intensity, persistence and limiting effects of these symptoms are not wholly credible." (R. 35.) In assessing Plaintiff's credibility, the ALJ considered seven factors and the objective medical evidence.[6] (*Id.*) The ALJ noted that there had "been no recurrence of cancer during [the] period under consideration" and that Plaintiff's "mastectomies and subsequent surgeries were elective." (R. 36.) The ALJ acknowledged that Plaintiff experienced pain as a result of her reconstructive surgeries but noted that the medical record reflected improvement in her pain level. (*Id.*) The ALJ also noted that the care for Plaintiff's non-cancer impairments had been "fairly routine" and that, notwithstanding Plaintiff's claims of "declining health," the record did not "reflect any significant change in Plaintiff's "overall condition" during the relevant period. (*Id.*) The ALJ "also note[d] that [Plaintiff] ha[d] an overall weak work history" and that her "medical history [was] not consistent with her allegations of disability." (*Id.*) As to Plaintiff's mental health impairments, the ALJ noted that

---

[6] The factors, as listed by the ALJ, are:

> (i) The claimant's daily activities; (ii) The location, duration, frequency, and intensity of the claimant's pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (v) Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (vi) Any measures other than treatment that the claimant uses or has used to relieve pain or other symptoms . . . ; and (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

(R. 35.)

Plaintiff was not receiving ongoing mental health care.  (*Id.*)  The ALJ concluded that he was "constrained from accepting [Plaintiff's] allegations of disability in light of the regulatory scheme guiding analysis of credibility."  (*Id.*)

In reaching this conclusion, the ALJ accorded "limited weight" to the opinion of the consultative psychiatric examiner, Dr. Subervi, that Plaintiff was unable to work.  (R. 33, 36.)  The ALJ explained that the examination results on which Dr. Subervi's opinion was based "were generally normal."  (R. 36.)  The ALJ explained that the record supported this finding because Plaintiff had not had ongoing mental health treatment and because her other medical providers had not noted "any significant mental symptoms or findings."  (*Id.*)  The ALJ accorded some weight to the GAF score of forty seven that Dr. Subervi assigned to Plaintiff, because he concluded that a GAF score is a "snap shot in time and not a function-by-function assessment."  (*Id.*)  The ALJ accorded "considerable weight" to Dr. Wise's opinion[7] because he determined that, although Dr. Wise was a non-examining source, he was a specialist whose opinion was not inconsistent with the overall medical record.  (*Id.*)  The ALJ accorded "some weight" to Dr. Krishnamurthy's opinion[8] because the medical record did not contain evidence of "significant

_____

[7]  Dr. Wise opined that Plaintiff was capable of "simple repetitive tasks; understanding and remembering basic tasks; carr[ing] out simple tasks; maintain[ing] concentration and attention for routine, [performing] uncomplicated tasks for two-hour periods during an eight hour workday; complet[ing] a normal workweek without excessive interruptions from psychologically based symptoms; relat[ing] to supervisors and coworkers; adapt[ing] to simple changes; and avoid[ing] work hazards."  (R. 33–34.)

[8]  Dr. Krishnamurthy determined that Plaintiff could (1) "lift and/or carry" twenty pounds "occasionally" and ten pounds "frequently," (2) "stand and/or walk" with normal breaks for "about" six hours in an eight-hour workday, (3) sit with normal breaks for "about" six hours in an eight-hour workday, and (4) "push and/or pull" without limitation, other than those limitations for lifting and carrying.  (R. 702.)  Dr. Krishnamurthy also determined that Plaintiff could climb stairs and ramps, balance, stoop, kneel, crouch and crawl "frequently," and climb ladders, ropes, or scaffolds "occasionally."  (R. 703.)  He further determined that Plaintiff's ability to reach was "limited" because of a right shoulder impingement syndrome.  (R. 704.)

limitations as to reaching," and he noted that the RFC accounts for Plaintiff's right shoulder impairment by "limiting lifting and carrying." (*Id.*)

Finally, the ALJ determined that Plaintiff was not capable of performing her past relevant work as an administrative assistant and telephone marketer, because those jobs required tasks that exceeded Plaintiff's functional capacity. (R. 37.) The ALJ concluded that, given Plaintiff's age, education, work experience and RFC, there were a significant number of jobs in the national economy that Plaintiff could perform. (R. 37–38.) Therefore, the ALJ determined that, from January 31, 2007 through the date of the decision, Plaintiff was not suffering from a "disability" as defined under the Act. (R. 38.)

### f.   Evidence submitted to the Appeals Council

Plaintiff submitted two pieces of evidence to the Appeals Council that were not before the ALJ; an opinion from Dr. Samuel Cohen and examination notes from Dr. Farah Atallah-Lajam. (R. 4–9.)

### i.   Dr. Samuel Cohen, M.D.

On February 24, 2014, Dr. Samuel Cohen, M.D., a physician at Mount Sinai, examined Plaintiff. (R. 12.) Dr. Cohen noted Plaintiff's history of domestic abuse and stated that, "at the current moment," she was being seen by a psychiatrist to treat her depression. (*Id.*) Dr. Cohen opined that Plaintiff was "going through a difficult emotional time" and recommended that she not work for a year. (*Id.*)

### ii.   Dr. Farah Atallah-Lajam

On March 13, 2014, Dr. Farah Atallah-Lajam, M.D., a cardiologist at Mount Sinai, examined Plaintiff. (R. 13–17.) Dr. Atallah-Lajam noted the various related tests that had previously been performed on Plaintiff: an echocardiogram on August 8, 2013, which revealed "mild" left atrial enlargement; an electrocardiography ("ECG") on November 14, 2013, which

revealed "poor R-wave progression"; and a stress test on November 18, 2013, which revealed

"moderate" abnormal perfusion.  (R. 16.)  Dr. Atallah-Lajam also conducted a coronary

angiography and catheterization, and diagnosed Plaintiff with coronary artery disease.  (R. 13,

16.)  Dr. Atallah-Lajam stated that Plaintiff's "main issue" was that she was "feeling very

depressed."  (R. 17.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine

whether the correct legal standards were applied and whether substantial evidence supports the

decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*,

416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per

curiam).  "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*,

805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971));

*McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same).  Once an ALJ finds facts, the court

"can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault

v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks

omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the

Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d

118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one

rational interpretation, the Commissioner's conclusion must be upheld.").  The Commissioner's

factual findings "must be given conclusive effect so long as they are supported by substantial

evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations

omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or

is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

SSI is available to, among others, individuals who are "disabled" within the meaning of the Act.[9] Federal disability insurance benefits are also available to individuals who are "disabled" within the meaning of the Act. For purposes of both SSI and disability benefits eligibility, to be considered disabled under the Act, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines

---

[9] SSI is available to individuals who are sixty five years of age or older, blind or disabled and meet certain income requirements. 42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202. The only issue before the Court is whether Plaintiff is disabled.

whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v))).

### c. Analysis

The Commissioner moves for judgment on the pleadings arguing that the ALJ's decision is supported by substantial evidence. (Comm'r Mem. 1.) Plaintiff argues that the ALJ erred by (1) failing to list ovarian, uterine and skin cancer, coronary disease, cholesterol, pancreatic disorder, rheumatoid arthritis, fibromyalgia, memory deficit and panic attacks among Plaintiff's severe impairments at step two of the sequential analysis; (2) failing to properly assess Plaintiff's mental impairments in determining her RFC, and (3) failing to properly assess Plaintiff's credibility. (Pl. Opp'n 2–3, 5.)

### i. The ALJ's Step Two analysis

Plaintiff argues that the ALJ erred because, at the second step of the sequential analysis, the ALJ did not find ovarian, uterine and skin cancer, coronary disease, cholesterol, pancreatic disorder, rheumatoid arthritis, fibromyalgia, memory deficit and panic attacks to be among

Plaintiff's severe impairments.  (Pl. Opp'n 2.)  The Commissioner argues that these impairments were not severe during the relevant period.  (Comm'r Reply 2.)

At the second step of the sequential analysis, the ALJ must determine whether the plaintiff has a severe impairment that significantly limits the plaintiff's physical or mental ability to do basic work activities.  *See* 20 C.F.R. § 416.920(c).  The plaintiff bears the burden to provide medical evidence demonstrating the severity of her condition.  *Miller v. Comm'r of Social Sec.*, No. 05-CV-1371, 2008 WL 2783418, at *6–7 (N.D.N.Y. July 16, 2008); *see also* 20 C.F.R. § 416.912(a).  Although the Second Circuit has held that the second step is limited to "screen[ing] out *de minimis* claims," *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe," *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995).

Where an ALJ excludes certain impairments from the list of severe impairments at the second step, any such error is harmless if the ALJ identifies other severe impairments such that the analysis proceeds and the ALJ considers the effects of the omitted impairments during subsequent steps.  *See O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) (finding any error by ALJ in excluding knee injury as a severe impairment was harmless because ALJ identified other severe impairments and considered knee injury in subsequent steps (citing 42 U.S.C. § 423(d)(2)(B))); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding any error by ALJ in excluding claims of anxiety disorder and panic disorder from step two of analysis would be harmless because ALJ identified other severe impairments and specifically considered the claims of anxiety and panic attacks in subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (finding remand would not be warranted due to

ALJ's failure to recognize disc herniation as a severe impairment because "the ALJ did identify severe impairments at step two, so that [plaintiff's] claim proceeded through the sequential evaluation process" and ALJ considered the "combination of impairments" and "all symptoms" in making determination); *Lasiege v. Colvin*, No. 12-CV-1398, 2014 WL 1269380, at *10–11 (N.D.N.Y. Mar. 25, 2014) (holding that, even if ALJ erred in failing to list headaches as severe impairment at step two, such error was harmless because other severe impairments were found and ALJ explicitly noted claimant's headaches during RFC determination).

However, where an ALJ's decision to exclude an impairment from the list of severe impairments is not supported by substantial evidence, and the ALJ fails to account for any functional limitations associated with the omitted impairments in determining the claimant's RFC, a court must remand for further administrative proceedings. *See Parker-Grose v. Astrue*, 462 F. App'x 16, 17 (2d Cir. 2012) ("[The claimant's] case must be remanded for further administrative proceedings, because the ALJ's finding that [the claimant's] 'medically determinable mental impairment of depression is nonsevere,' is not supported by substantial evidence and the Commissioner failed to account for any functional limitations associated with [the claimant's] depression when determining her residual functional capacity . . . .")

The ALJ found that Plaintiff's severe impairments consisted of "a history of breast cancer with subsequent mastectomies and reconstructive surgeries; diabetes; hypertension; asthma; degenerative joint disease of the right shoulder and tendinitis; obesity; and depression and anxiety." (R. 29.) The ALJ noted that, although the record contained evidence of "acute pancreatitis with laparoscopic cholecystectomy, osteoporosis, gastroesophageal reflux disease (GERD)/ulcers, hemorrhoids, a knee impairment, and temporomandibular joint disorder (TMJ)," these were not severe impairments because they did not significantly limit Plaintiff's ability to

perform "basic work activities."  (R. 29.)  Plaintiff contends that the ALJ erred by not finding

that her ovarian, uterine and skin cancer, all in remission, coronary disease, cholesterol,

pancreatic disorder, rheumatoid arthritis, fibromyalgia, memory deficit, and panic attacks

constituted severe impairments.  (Pl. Opp'n 2.)

There is no evidence in the record that Plaintiff suffered from coronary disease during the

relevant period.  The only medical report that discusses Plaintiff's coronary disease is the March

13, 2014 report from Plaintiff's cardiologist, Dr. Atallah-Lajam, pertaining to procedures from

August 8, 2013.  (*See* R. 13–17.)  This evidence was not submitted to the ALJ but to the Appeals

Council.  (R. 4–9.)  Because the notes relate to a period after the relevant disability period — the

date of the ALJ decision on December 14, 2012 — the Appeals Council correctly determined

that the notes did "not provide a basis for changing" the ALJ's determination.  (R. 5.)  *See Brown*

*v. Comm'r of Soc. Sec.*, 709 F. Supp. 2d 248, 257–58 (S.D.N.Y. 2010) (holding that evidence

submitted to the Appeals Council which revealed that the claimant was treated for emphysema

almost two years after the date of the ALJ's decision did not relate to the relevant period where

there was no evidence in the record that the claimant was suffering from emphysema during the

relevant period).  Accordingly, the ALJ not did err by determining that Plaintiff's coronary

disease was not a severe impairment.

As to Plaintiff's ovarian, uterine and skin cancer, cholesterol, pancreatic disorder,

rheumatoid arthritis, fibromyalgia, memory deficit, and panic attacks, although the ALJ did not

find these impairments to be severe at the second step, the analysis at the subsequent steps

indicates that the ALJ's RFC determination was based on "the entire record," and that the ALJ

"considered all symptoms."  (R. 30.)  In reaching his conclusion that Plaintiff is not disabled, the

ALJ discussed Plaintiff's history of cancers and related surgeries, (R. 31–34, 36); Plaintiff's

complaints of "chronic pain" and feeling "pain throughout her body" as well as a diagnosis of "chronic pain syndrome," (R. 31–34, 36); Plaintiff's multiple diagnoses of hypertension and history of hyperlipidemia, (R. 31–32); Plaintiff's history of rheumatoid arthritis and a diagnosis of right shoulder arthritis, (R. 32–33); Plaintiff's treatment for gastrointestinal issues and diagnoses of "acute pancreatitis" and "gallstone pancreatitis," (R. 34–35); and Plaintiff's mental health, noting the findings regarding her memory and a diagnosis of anxiety disorder, (R. 33). Therefore, because the ALJ's decision demonstrates that he considered these impairments in subsequent steps, any error in failing to list these impairments as severe impairments at step two was harmless. *See O'Connell*, 558 F. App'x at 65; *Reices-Colon*, 523 F. App'x at 798; *Stanton*, 370 F. App'x at 233 n.1.

### ii. The ALJ's RFC determination as to Plaintiff's mental impairments

Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence because, in assessing her mental impairments, the ALJ (1) discounted the opinion of Dr. Subervi, the consultative psychiatric examiner, who examined Plaintiff and opined that she was disabled, and (2) improperly relied on the opinion of Dr. Wise, a non-examining source. (Pl. Opp'n 5.) The Commissioner argues that "substantial evidence supports the ALJ's mental RFC." (Comm'r Reply 4–5.)

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545. With respect to a claimant's mental abilities, an RFC determination indicates the "nature and extent" of a claimant's mental limitations and capacity for work activity on a regular and continuing basis. *Id*. § 404.1545(c). For example, a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision,

co-workers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." *Id.* In determining the RFC, "the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 312 (W.D.N.Y. 2013) (alteration in original) (quoting *Stanton v. Astrue*, No. 07-CV-803, 2009 WL 1940539, at *9 (N.D.N.Y. July 6, 2009) (citing 20 C.F.R. § 404.1545(b–e))). "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (first citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000); and then citing *Zorilla v. Chater*, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996)).

"Before an ALJ classifies a claimant's RFC based on exertional levels of work (*i.e.*, whether the claimant can perform sedentary, light, medium, heavy or very heavy work) he 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . .'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). Social Security Ruling 96-8p notes that "a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions." *Id.* at 176 (quoting SSR 96–8p, 1996 WL 374184, at *4). The Second Circuit has held that failure to conduct an explicit function by function analysis at the RFC finding step is not *per se* error requiring remand, but it has reiterated that "remand may be appropriate, where an ALJ fails to assess a claimant's capacity to perform

relevant functions, despite contradictory evidence in the record." *Id.* at 177.

The ALJ determined that Plaintiff could perform "light work" subject to certain limitations. (R. 30.) As to Plaintiff's mental impairments, the ALJ determined that Plaintiff was "limited to understanding, remembering, and carrying out simple instructions, making simple work related decisions, and dealing with changes in a routine work setting." (*Id.*) The ALJ also determined that Plaintiff retained "the ability to respond appropriately to coworkers and supervisors." (*Id.*) In reaching his RFC determination, the ALJ relied on (1) the opinion of the consultative examiner, Dr. Subervi, which the ALJ accorded "limited weight," (2) the opinion of Dr. Wise, who did not examine Plaintiff, but whose opinion the ALJ accorded "considerable" weight and found to be "not inconsistent with the overall record of the medical findings of Plaintiff's examining physicians, and (3) Plaintiff's GAF score, apparently as assessed by Dr. Subervi.

### 1. Dr. Subervi's opinion does not provide substantial support for the RFC determination

Dr. Subervi diagnosed Plaintiff with severe major depressive disorder and generalized anxiety disorder. (R. 700.) He opined that Plaintiff was unable to work. (*Id.*) The ALJ accorded "limited weight" to Dr. Subervi's opinion that Plaintiff had severe major depressive disorder and generalized anxiety disorder, and was unable to work. (R. 36.) The ALJ acknowledged that Dr. Subervi's opinion was based on his examination of Plaintiff, but the ALJ found that Dr. Subervi's examination findings were "generally normal." (*Id.*) The ALJ also "considered and accorded some weight" to Dr. Subervi's opinion that Plaintiff's GAF score was forty seven (*Id.*) The ALJ noted that a GAF score is only a "snap shot in time and not a function-by-function assessment" and determined that the medical record did not include evidence of "any long standing mental limitations." (*Id.*)

Where the opinions of nontreating and nonexamining sources are considered, the weight to which such evidence is entitled depends upon the following factors prescribed by regulation: "(1) the length, nature, and extent of the relationship between the claimant and the physician; (2) the supportability of the physician's opinion; (3) the consistency of the physician's opinion with the record as a whole; and (4) the specialization of the physician providing the opinion." *Rodriguez v. Colvin*, No. 13-CV-7607, 2015 WL 1903146, at *16 (S.D.N.Y. Mar. 31, 2015) (citing 20 C.F.R. § 416.927(c)(2)–(5)). "An ALJ may also consider 'other factors . . . which tend to support or contradict the opinion,' such as 'the amount of understanding of [the] disability programs and their evidentiary requirements that an acceptable medical source has,' and 'the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record.'" *Id.* (citing 20 C.F.R § 416.927(c)(6)). In assessing the length, nature and extent of the relationship between the claimant and the physician for purposes of the first factor, "[g]enerally, . . . more weight [is given] to the opinion of a source who has examined [the plaintiff] than to the opinion of a source who has not examined [the plaintiff]." 20 C.F.R. § 416.927(c)(1); *see Filocomo v. Chater*, 944 F. Supp. 165, 170 n.4 (E.D.N.Y.1996) ("[T]he conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight.").

However, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. In particular, "[i]n the case of mental disabilities, '[t]he results of a single examination may not adequately describe [the claimant's] sustained ability to function" and thus it is "vital" to "review all pertinent information relative to [the claimant's] condition, especially at times of increased stress." *Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-6704, 2015 WL 321832, at *28 (S.D.N.Y. Jan. 23, 2015) (second, third and fourth

alterations in original) (quoting 20 C.F.R. Pt. 404, subpt. P, App 1 § 12.00(E)); *see Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182–83 (E.D.N.Y. 2011) ("[T]he opinion of a consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.' This is because 'consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" (citations omitted)); *Anderson v. Astrue,* No. 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) ("Generally, the opinion of a consultative physician, who only examined plaintiff once, should not be accorded the same weight as the opinion of plaintiff's treating psychotherapist."); *see also Roman v. Astrue*, No. 10-CV-3085, 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." (quoting *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010))).

The ALJ properly determined that Dr. Subervi's findings were entitled only to "limited" weight because Dr. Subervi examined Plaintiff only once. Moreover, although Dr. Subervi's report included a detailed recounting of Plaintiff's stated mental health history and functioning, it did not undertake any RFC assessment or opine as to Plaintiff's specific non-exertional capacities. *See Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000), *superseded by statute on other grounds*, 20 C.F.R. § 404.1560(c)(2). As the Second Circuit stated in *Curry*, "[w]hile the opinions of treating or consulting physicians need not be reduced to any particular formula, [the consultative examiner's] opinion is so vague as to render it useless in evaluating whether [claimant] can perform sedentary work." *Id*. (explaining that, "[i]n particular, [the consultative examiner's] use of the terms 'moderate' and 'mild,' without additional information, does not

permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference that [claimant] can perform the exertional requirements of sedentary work").

Dr. Subervi's opinion failed to address Plaintiff's non-exertional capacities and therefore does not provide sufficient support for the ALJ's specific functional assessments that Plaintiff "is limited to understanding, remembering, and carrying out simple instructions, making simple work related decisions, and dealing with changes in a routine work setting" and that "[s]he retains the ability to respond appropriately to coworkers and supervisors." (R. 30); *see Selian*, 708 F.3d at 421 ("[The consultative examiner's] opinion is remarkably vague. What [the consultative examiner] means by 'mild degree' and 'intermittent' is left to the ALJ's sheer speculation. . . . [The] opinion does not provide substantial evidence to support the ALJ's finding that [the claimant] could lift 20 pounds occasionally and 10 pounds frequently."); *Ubiles v. Astrue*, No. 11-CV-6340, 2012 WL 2572772, at *11 (W.D.N.Y. July 2, 2012) (holding that the consultative examiner's opinion that the plaintiff had "moderate limitations in standing, walking, climbing stairs, and lifting minor weights . . . was entirely too vague to serve as a proper basis for an RFC" (collecting cases)); *Hilsdorf*, 724 F. Supp. 2d at 348 (holding that the consultative examiner's "statement that [the] [p]laintiff had 'limitations of a mild degree of lifting, bending, walking, standing, and pushing and pulling on arm controls'" could not "serve as an adequate basis for determining [the] [p]laintiff's RFC" because it "did not provide enough information to allow the ALJ to make the necessary inference that [the] [p]laintiff could perform sedentary work").

For the above reasons, Dr. Subervi's opinion does not provide substantial evidence for the ALJ's RFC determination.

## 2. Dr. Wise's opinion does not provide substantial evidence for the RFC determination

It was also inappropriate for the ALJ to give the opinion of Dr. Wise "considerable" weight, as Dr. Wise did not examine Plaintiff and his assessment of her non-exertional capacities is not supported by other evidence in the record. The ALJ found that the opinion was "not inconsistent with the overall record, including nature and extent of care." (R. 36.)

"The general rule regarding the written reports of medical advisors who have not personally examined a claimant is that such reports deserve little weight in the overall evaluation of disability." *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 236 (E.D.N.Y. 2014) (citing *Vargas v. Sullivan*, 898 F.2d 293, 295–96 (2d Cir. 1990)) (explaining that an "advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant" (citations omitted)); *see also Hidalgo v. Bowen*, 822 F.2d 294, 298 (2d Cir. 1987) (holding that the testimony of a nonexamining medical advisor "does not constitute evidence sufficient to override the treating physician's diagnosis"); *Hilsdorf*, 724 F. Supp. 2d at 348 (finding that the report of a non-examining physician could not, standing on its own, support ALJ's RFC determination (citing *Vargas*, 898 F.2d at 296)); *Filocomo v. Chater*, 944 F. Supp. 165, 170 n.4 (E.D.N.Y. 1996) (Reliance on an RFC assessment "completed by a doctor who never physically examined Plaintiff" would be "unfounded, as the conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight.").

However, "the opinion of a non-examining consultant may constitute substantial evidence in support of the ALJ's determination where . . . other evidence in the record supports it." *Coburn v. Astrue*, No. 07-CV-0029, 2009 WL 4034810, at *6 (N.D.N.Y. Nov. 19, 2009) (citing *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995)); *see Ritter v. Astrue*, 32 F. Supp. 3d

193, 206 (N.D.N.Y. 2012) (stating that reliance on the opinion of a non-examining medical consultant "is particularly appropriate where, as here, the opinions of the medical consultants are supported by the weight of the evidence"); *Leach ex. rel. Murray v. Barnhart*, No. 02-CV-3561, 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole."); *Brunson v. Barnhart*, 01-CV-1829, 2002 WL 393078, at *14 (E.D.N.Y. Mar. 14, 2002) (holding that opinions of non-examining sources may be considered where they are supported by evidence in the record); *see also* 20 C.F.R. § 404.1527(c)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.").

Dr. Wise reviewed Plaintiff's medical records and opined that Plaintiff had "mild" restrictions of daily living activities and "mild" difficulties in maintaining social functioning. (R. 719.) Dr. Wise observed that Plaintiff had not had extended episodes of decompensation. (R. 719.) Dr. Wise opined that Plaintiff was not significantly limited in her understanding and memory or in her social interaction. (R. 723–24.) Dr. Wise also opined that Plaintiff was "moderately" limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and set realistic goals or make plans independently of others. (*Id.*) Dr. Wise also opined that Plaintiff had the mental capacity for

simple repetitive type tasks, could understand and remember basic tasks, carry out simple tasks, maintain attention and concentration for routine uncomplicated tasks for two-hour periods during an eight-hour workday, complete a normal workweek without excessive interruptions from psychologically based symptoms, relate to supervisors and co-workers and adapt to simple changes and avoid hazards. (R. 725.)

The ALJ concluded that this opinion was "not inconsistent with the overall record," but did not specifically identify the medical evidence that the ALJ concluded supported Dr. Wise's findings as to Plaintiff's specific non-exertional capacities. (R. 36.) Reviewing the record, as summarized by the ALJ, it is not apparent what records the ALJ believed Dr. Wise relied on to support his opinion as to Plaintiff's specific mental functioning abilities.

Dr. Riascos, the only psychiatrist to examine Plaintiff, determined that Plaintiff "endorsed mild depressive symptoms," which were improving because of her medication and noted that Plaintiff "was sleeping/eating well and had no hopeless/helplessness," "anhedonia," "suicidal/homicidal ideations" or "symptoms of manic/psychotic disorder." (R. 2496–97.) Dr. Riascos also diagnosed rule out "malingering vs. factitious disorder" because of "inconsistencies in [Plaintiff's] story," which he did not find believable. (R. 2496–97.) Dr. Chatterjee diagnosed plaintiff with major depressive disorder, but noted that Plaintiff did not have suicidal ideation. (R. 2477–78.) Dr. Chatterjee prescribed Zoloft and, in a follow up visit, Plaintiff reported that the Zoloft was producing "better" results. (R. 2480.) Dr. Perez diagnosed Plaintiff with depression but noted that her appearance, mood and affect were normal and that Plaintiff's "thought content" did not reveal an impairment. (R. 346.)

Although these sources consistently diagnosed Plaintiff with mental health impairments and depression, the record does reflect any support for Dr. Wise's findings as to the particular

extent that Plaintiff's mental health impairments limited her non-exertional capacities. Absent

support from the record, the opinion of Dr. Wise, a non-treating source, was not entitled to the

"considerable" weight assigned by the ALJ, and it fails to provide substantial evidence for the

ALJ's determination that Plaintiff has the RFC for light work.

### 3. Duty to develop the record

Because there is not sufficient medical evidence supporting the ALJ's RFC determination

that Plaintiff could perform light work, the ALJ was obligated to develop the record. Although a

"claimant has the general burden of proving that he or she has a disability within the meaning of

the Act, . . . 'because a hearing on disability benefits is a nonadversarial proceeding, the ALJ

generally has an affirmative obligation to develop the administrative record.'" *Burgess v. Astrue*,

537 F.3d 117, 128 (2d Cir. 2008) (alteration omitted) (first citing *Draegert v. Barnhart*, 311 F.3d

468, 472 (2d Cir. 2002); and then quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); *see

also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) ("Unlike a judge at trial,

the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and

against the granting of benefits.'" (quoting *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305

(2d Cir. 2011))). This duty is present "[e]ven when a claimant is represented by counsel."

*Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (collecting cases); *see Eusepi v. Colvin*, 595

F. App'x 7, 9 (2d Cir. 2014) ("[T]he ALJ's general duty to develop the administrative record

applies even where the applicant is represented by counsel . . . ."); *Doria v. Colvin*,

No. 14-CV-7476, 2015 WL 5567047, at *7 (S.D.N.Y. Sept. 22, 2015) ("The ALJ's duty to

develop the record includes a duty to resolve apparent ambiguities relevant to the ALJ's

disability determination." (citation omitted)); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 279

(N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record, even if the claimant

is represented by counsel, if the medical record is ambiguous or incomplete. (first citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); and then citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))).

An ALJ does not need to affirmatively obtain the RFC opinion of a treating physician where there are no obvious gaps in the medical history. *Swiantek v. Comm'r of Soc. Sec.*, 588 Fed. App'x 82, 84 (2d Cir 2015); *see Tankisi*, 521 F. App'x at 33–34 (holding that the absence of a medical source statement from a claimant's treating physicians is not necessarily fatal to the ALJ's determination); *Rosa*, 168 F.3d at 79 n.5 (explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information); 20 C.F.R. § 404.1520b(c)(1) (requiring the ALJ to obtain additional evidence only if the ALJ cannot decide whether a claimant is disabled based on the existing evidence). Nevertheless, while an ALJ may, in some circumstances, proceed without a medical source opinion as to the claimant's functional limitation, there must still be "sufficient evidence" for the ALJ to properly make the RFC determination. *See Sanchez v. Colvin*, No. 13-CV-6303, 2015 WL 736102, at *6 (S.D.N.Y. Feb. 20, 2015) ("Significantly, the administrative record here is a far cry from [those], which have excused the ALJ's failure to seek a treating physician's opinion based on the completeness and comprehensiveness of the record."); *Downes v. Colvin*, No. 14-CV-7147, 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (noting that "the treatment notes and test results from [the plaintiff's] treating physicians do not assess how [the plaintiff's] symptoms limited his functional capacities" and remanding for further findings); *cf. Swiantek*, 588 F. App'x at 84 ("Given the extensive medical record before the ALJ in this case, we hold that there were no 'obvious gaps' that necessitate remand solely on the ground that the ALJ

failed to obtain a formal opinion from [the] treating physicians . . . ."); *Tankisi*, 521 F. App'x at 34 (emphasizing the "extensive record" available to the ALJ).

Here, the record was not sufficiently developed for the ALJ to assess Plaintiff's RFC as to her non-exertional limitations resulting from her mental health condition, and it was the ALJ's duty to develop the record. While the record does contain occasional mental health diagnoses of Plaintiff, it contains neither treating records nor a functional capacity assessment from any treating or non-treating source that examined Plaintiff. Absent such an assessment, the objective medical evidence provides minimal insight into Plaintiff's functional limitations arising from her mental health condition. Thus, it is unclear where the ALJ obtained support for his conclusions as to her non-exertional limitations, other than the opinion of Dr. Wise who did not review Plaintiff and whose opinion is not clearly supported by any evidence in the medical record.

The ALJ could have attempted to obtain a functional capacity assessment from the psychiatrists at Elmhurst Hospital, who had examined Plaintiff. *See Marshall v. Colvin*, No. 12-CV-6401, 2013 WL 5878112, at *9 (W.D.N.Y. Oct. 30, 2013) ("Where a treating physician has not assessed a claimant's RFC, the ALJ's duty to develop the record requires that he *sua sponte* request the treating physician's assessment of the claimant's functional capacity." (first citing *Myers v. Astrue*, No. 06-CV-0331, 2009 WL 2162541 (N.D.N.Y. July 17, 2009); and then citing *Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594 (E.D.N.Y. Sept.11, 2012))); *Aceto v. Comm'r of Soc. Sec.*, No. 08-CV-169, 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20, 2012) ("Since the ALJ had nothing more than treatment records and consultative reports to review, he had an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC.").

The ALJ also could have followed up with Dr. Subervi, who provided a consultative

examination of Plaintiff but failed to opine as to Plaintiff's specific non-exertional capacities. *See Cadet v. Colvin*, 121 F. Supp. 3d 317, 320–21 (W.D.N.Y. 2015) (explaining that, where a record contained only a brief medical history, "no RFC assessments by any treating or examining physician" and no "evidence that the ALJ requested such assessments from plaintiff's treating physicians, or directed the plaintiff to obtain them," the ALJ failed in a duty to obtain missing records or "to order whatever consultative examinations might be appropriate to cover the gap"); *Stackhouse v. Colvin*, 52 F. Supp. 3d 518, 521 (W.D.N.Y. 2014) ("Failure to obtain a valid consultative examination when necessary is reversible error."); *Falcon v. Apfel*, 88 F. Supp. 2d 87, 90–91 (W.D.N.Y. 2000) (finding that the "the ALJ had an obligation to further develop the record and clarify the opinion of the consulting physician" whose report was "inconclusive," in order to comply with the ALJ's obligation to order a consultative examination when "[a] conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved" (quoting 20 C.F.R. § 404.1519a(b)(4))). Given the ALJ's failure to develop the record and obtain an assessment of Plaintiff's non-exertional capacities and the lack of support for his RFC assessment, the Court vacates the Commissioner's decision and remands for further fact finding.

### iii. The ALJ's credibility assessment

Plaintiff argues that the ALJ erred in finding that she was not credible as to the intensity, persistence and limiting effects of her impairments because the ALJ improperly weighed whether Plaintiff's testimony was consistent with the medical evidence in the record. (Pl. Opp'n 3–4.) The Commissioner argues that the ALJ correctly determined Plaintiff's credibility because her testimony was inconsistent with substantial evidence in the record. (Comm'r Reply 3–4.)

Because the Court remands the case for further consideration of the medical evidence, the Court will not address Plaintiff's argument as the ALJ's errors impact the Court's ability to

review the credibility determination.

**III. Conclusion**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 31, 2016
       Brooklyn, New York